## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel.* Joseph Bowen, and JOSEPH BOWEN, individually, | **Civil Action No.**   2:17-cv-936 |
| Relator-Plaintiff, | **Judge**: Sargus     **Magistrate Judge**: Jolson |
| v. | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2) AND LOCAL RULE 3.2** |
| KARVO COMPANIES, INC. and KARVO TRUCKING, LTD., | **DO NOT PUT ON PACER** |
| Defendants. | **JURY TRIAL DEMANDED** |

### FALSE CLAIMS ACT COMPLAINT

Relator-Plaintiff Joseph Bowen (hereinafter referred to as "Relator-Plaintiff") brings this action on his own behalf and on behalf of the United States of America under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), to recover federal funds paid to Karvo Companies, Inc. and Karvo Trucking, Ltd. (collectively referred to as "Defendants") as a result of false and fraudulent statements and claims for payment made by Defendants on contracts awarded by the Ohio Department of Transportation (hereinafter referred to as "ODOT") concerning the use of disadvantaged business enterprises ("DBEs") and the payment of the prevailing wage.

## I.   INTRODUCTION

1.     On behalf of the United States of America (hereinafter referred to as "United States" and/or "Government"), and pursuant to the *qui tam* provisions of the FCA, Relator-Plaintiff files this *qui tam* Complaint under seal against Defendants for treble damages and civil

penalties arising from Defendants' conduct in violation of the FCA, as well as on his own behalf for damages resulting from Defendants' retaliation and nonpayment of the prevailing wage.

2.      Karvo Companies, Ltd. (hereinafter referred to as "Karvo") obtained contracts totaling in excess of $250 million from ODOT for the performance of work on Ohio's highways, roads and other public works. In order to obtain these contracts and subsequently to receive payments under the ODOT contracts, Karvo made statements and certifications concerning the use of DBEs and payment of the prevailing wage in accordance with federal laws and regulations administered by the U.S. Department of Transportation (hereinafter referred to as "DOT"), which are necessary to obtain federal funds distributed through ODOT.

3.      Rather than comply with federal law, Karvo was instead engaged in a fraudulent scheme to capture additional profit on ODOT contracts by allocating work to its related entity Karvo Trucking, Ltd. (hereinafter referred to as "Karvo Trucking"), instead of using and paying DBEs. Work performed by Karvo Trucking was less expensive for Karvo than using DBEs in part because Defendants were not paying their employee asphalt truck drivers the prevailing wage.

4.      Through their conduct, Defendants violated federal law knowingly, attempting to conceal the DBE fraud from ODOT in part through falsified trucking tickets that would otherwise have revealed the use of Defendant's trucks instead of trucks owned and operated by DBEs.

5.      As a result of this scheme and as alleged further herein, Defendants have systematically defrauded the United States and the State of Ohio out of millions of dollars by obtaining ODOT contracts and submitting claims for payments under ODOT contracts, which were paid for in part with federal funds, through intentional misrepresentations in bid

submissions and the submission of false or fraudulent claims for payment to ODOT, as well as causing false statements to DOT, since at least 2012.

6.     When Relator-Plaintiff reported this conduct to ODOT, Defendants retaliated against him and refused to employ him further.

## II.    **THE PARTIES**

7.     Between 2006 and 2016, Relator-Plaintiff was employed by Defendants as an asphalt truck driver performing seasonal work. Relator-Plaintiff possesses an Ohio Class A Commercial Drivers License and has extensive experience as a truck driver, including previous work for truck brokers who deal with Karvo and other ODOT prime contractors. In addition to his duties driving a truck for Defendants, Relator-Plaintiff also served as a truck boss for Defendants between 2010 and 2016. As a truck boss, Relator-Plaintiff was responsible for knowing the whereabouts and duties of all trucks and drivers on his work site, whether owned and operated by Defendants or a subcontractor, at any given time.

8.     Defendant Karvo Companies, Inc. ("Karvo") is an Ohio Limited Liability Corporation located at 4524 Hudson Drive, Stow, Ohio 44224, and owned by George Karvounides. Established in 1989, Karvo was initially known as Karvo Paving, Co., before formally changing its name on March 18, 2016.  Karvo performs the majority of its work as a general contractor for ODOT on asphalt, construction, concrete, and utility contracts. In 2016, Karvo employed more than 300 individuals.

9.     Defendant Karvo Trucking, Ltd. ("Karvo Trucking") is an Ohio Limited Liability Corporation owned by George Karvounides and his brother Gust Karvounides. Karvo Trucking is located at 4524 Hudson Drive, Stow, Ohio 44224. Upon information and belief, Karvo Trucking is the owner of the Karvo trucks used in the fraudulent scheme detailed herein.

10.     Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein.  In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

11.     At all times relevant hereto, Defendants acted through their agents and employees, and the acts of Defendants' agents and employees were within the scope of their agency and employment. The policies and practices alleged in this Complaint were, on information and belief, established and/or ratified at the highest corporate levels of Defendants.

## III.    SOURCE OF RELATOR-PLAINTIFF'S ALLEGATIONS

12.     Relator-Plaintiff's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative proceeding in which the United States is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

13.     Relator-Plaintiff is the original source of the information upon which this Complaint is based, as that phrase is used in the FCA, and has voluntarily disclosed to the United States the material allegations herein prior to filing this action.

14.     Relator-Plaintiff brings this action based on his direct knowledge and, where indicated, on information and belief, supplemented by additional factual investigation undertaken on his behalf and at his direction.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4).

## IV.     FEDERAL JURISDICTION AND VENUE

15.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

16.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District.  Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District.  31 U.S.C. § 3732(a).

17.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

## V.     THE FALSE CLAIMS ACT

18.     The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government."  S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266.

19.     The FCA provides for treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States, or knowingly using a false record or statement material to get false claims paid by the United States.  The FCA provides for a civil penalty and treble damages against any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F) or (G)[.]

31 U.S.C. § 3729(a)(1).

20.     "Knowing," within the meaning of the FCA, is defined to include reckless

disregard and deliberate indifference to the truth or falsity of the information. *Id.* § 3729(b)(1).

21.     Under the FCA, the United States is entitled to recover three times the amount of damages sustained and, for each claim, statement or overpayment, a civil penalty of not less than $5,000 and not more than $10,000, as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990. 31 U.S.C. § 3729(a)(1).

## VI.     DOT'S DISADVANTAGED BUSINESS ENTITY ("DBE") PROGRAM

22.     DOT distributes substantial federal funds each year to finance state and local construction, public transit, and airport agency projects. Recipients of Federal Highway Funds, Federal Transit Funds and Federal Airport Funds (collectively "DOT funds") are required by statute to expend at least 10% of the DOT funds they receive with "small business concerns owned and controlled by socially and economically disadvantaged individuals" – commonly referred to as "Disadvantaged Business Entities" or "DBEs". *See* Safe, Accountable, Flexible, Efficient Transportation Equity Act, 23 U.S.C. § 101; 49 C.F.R. §§ 26.3, 26.21.

23.     The objectives of the DBE program are to, *inter alia,* ensure nondiscrimination in the award and administration of DOT-assisted contracts, create a level playing field in which DBEs can compete fairly for DOT-assisted contracts, assist the development of firms that can compete successfully in the marketplace outside the DBE program, and help remove barriers to the participation of DBEs in DOT-assisted contracts. 49 C.F.R. § 26.1(a-g).

24.     In order to receive DOT funds for projects, ODOT must develop and implement a DBE program that conforms to DOT standards set forth in 49 C.F.R. Part 26. They must agree to abide by the regulations set forth in 49 C.F.R. Part 26 in dispersing funds to DBEs through awards of contract and subcontract work in order to remain eligible to receive federal funds. 49 C.F.R. § 26.13.

25.     On its website, ODOT makes clear that its compliance with DOT's DBE

regulations are mandatory:

> As a recipient of federal-aid highway and federal transit funds authorized under
> numerous acts (most recently the FAST Act), **ODOT is required to comply with
> DOT's DBE regulations**. As a Federal Highway Administration (FHWA)
> primary recipient and a Federal Transit Administration (FTA) recipient receiving
> more than $250,000 in FTA funds in a federal fiscal year, ODOT must also have a
> DBE program, a signed and dated DBE policy statement, a DBE liaison officer,
> and prompt payment mechanisms, among other requirements. ODOT's DBE
> program objectives mirror those of the U.S. Department of Transportation.
> **ODOT's DBE policy statement** is available at the beginning of its **DBE
> program document**, which sets out the mechanisms ODOT uses to ensure
> compliance with DOT's DBE regulations.

Available at https://www.dot.state.oh.us/Divisions/ODI/SDBE/Pages/DBE.aspx (emphasis in

original, internal hyperlink omitted).

26.     The DOT regulatory framework requires ODOT to establish annual statewide

participation goals. Between Fiscal Years 2011 and 2014, ODOT's DBE goal for federally-

funded highway construction and design contracts was between 8.9 and 10%. For Federal Fiscal

Years 2017-2019, ODOT's DBE goal is 15.6%.

27.     When a state establishes a DBE contract goal as part of its efforts to meet the

overall statewide goal, the state is required to award the contract only to a bidder or offeror who

meets or makes good faith efforts to meet the contract goal. 49 C.F.R. § 26.53. Once the contract

is awarded, the contractor's representation that it will meet or has made a good faith effort to

meet the contract goal is a contractual commitment subject to sanctions for its breach. 49 C.F.R.

§ 26.13(b). Specifically, each contract must include the following provision:

> The contractor, sub recipient or subcontractor shall not discriminate on the basis
> of race, color, national origin, or sex in the performance of this contract. The
> contractor shall carry out applicable requirements of 49 CFR Part 26 in the award
> and administration of DOT-assisted contracts. Failure by the contractor to carry
> out these requirements is a material breach of this contract, which may result in
> the termination of this contract or such other remedy as the recipient deems

> appropriate, which may include, but is not limited to: (1) Withholding monthly progress payments; (2) Assessing sanctions; (3) Liquidated damages; and/or (4) Disqualifying the contractor from future bidding as non-responsible.

*Id.*

28.      In order to become certified as a DBE, entities are required to participate in DOT's Unified Certification Program (UCP), which is administered by each state. 49 C.F.R. § 26.81(a). Under this program, primary responsibility for enforcing the certification standards is delegated to the respective states. In Ohio, the UCP program is administered by ODOT. *See* http://www.dot.state.oh.us/Divisions/ODI/SDBE/Pages/UCP.aspx.

*29.*      A small business owned and controlled by socially and economically disadvantaged individuals must certify that they are eligible for DBE status pursuant to the certification standards of 49 C.F.R. Part 26. 49 C.F.R. § 26.61.

30.      DBEs must again certify their compliance with the DBE regulations when seeking payment for work performed. For instance, in Ohio, a DBE must certify that it is in compliance with the eligibility requirements set forth in 49 C.F.R. Part 26 by signing an Affidavit of Subcontractor Payment that specifically states that:

> By signing below, the noted firms agree that the payment amounts recorded above are true and accurate as the payment time period notes above. Furthermore, by signing, the noted firms attest to the fact that the DBE listed above has performed a "commercially useful function" and abided by all other requirements of the DBE program as defined in Title 49 of the United States Code of Federal Regulations Part 26.

31.      The DBE rules are intended to ensure the integrity of the program, including requirements that the DBE actually perform the work, perform a "commercially useful function" and receive payments for all amounts counted toward DBE participation.

32.      It is well recognized that compliance with the certification and other requirements of the DBE program is a material condition of payment of DOT funds.  Since January 1, 2011,

DOT's OIG investigations of DBE fraud have resulted in financial recoveries, restitution and forfeiture of over $245 million as well as 425 months of incarceration.

## VII.    THE DAVIS-BACON ACT AND THE OHIO PREVAILING WAGE

33.    On applicable contracts, such as the contracts identified herein, the Davis-Bacon Act requires government contractors to pay eligible workers the prevailing wage, without deduction and without exception. 40 U.S.C. § 3142.

34.    The contractor and any subcontractor must also certify to the government that it is providing correct and complete payroll information that identifies all laborers at the contract worksite and that all such laborers are paid the requisite prevailing wages. 40 U.S.C. § 3145; 29 C.F.R. § 5.5(a)(3)(i) & (ii)(A)-(B). These documents are known as payroll certifications.

35.    The falsification of any of the above certifications can subject the contractor or subcontractor to civil prosecution under the False Claims Act. 29 C.F.R. § 5.5(a)(3)(ii)(D).

36.    As applied, the Davis-Bacon Act requires laborers, mechanics, and drivers who are not "owner-operators" be paid prevailing wages for work performed within the "site of work," as described in 29 C.F.R. §§ 5.2(I)(1-2). "The site of work is the physical place or places where the building or work called for in the contract will remain; and any other site where a significant portion of the building or work is constructed, provided that such site is established specifically for the performance of the contract or project." 29 C.F.R. § 5.5(I)(1).

37.    Work areas located outside of the site of permanent construction, including headquarters, tool yards, batch yards, and borrow pits, may be part of the site of work "provided they are dedicated exclusively, or nearly so, to performance of the contract or project, and provided they are adjacent or virtually adjacent to the site of work." 29 C.F.R. § 5.5(I)(2).

38.     The terms "construction, prosecution, completion, or repair" mean all types of work done on a particular building or work at the site (including work at a facility deemed part of the "site of the work") by laborers and mechanics of a construction contractor or construction subcontractor. 29 C.F.R. § 5.2(j).

39.     Drivers of a contractor or subcontractor, which are relevant to the instant filing, are covered by the Davis-Bacon Act for time spent working on the site of the work and for time spent loading and/or unloading materials and supplies on the site of work if such time is not *de minimus*. (Department of Labor Prevailing Wage Resource Book, DBA/DBRA Compliance Principles, at p. 7, available at: https://www.dol.gov/whd/recovery/pwrb/Tab9.pdf ).

40.     The Federal-Aid Highway Acts extended the Davis-Bacon Act prevailing wage provisions to all federally funded construction contracts on Federal-Aid highways in the 50 United States, the District of Columbia, Guam, Puerto Rico, the Virgin Islands or other territories. 29 C.F.R. § 5.1(a); 23 U.S.C. § 113(a). Federal-Aid Highways are public highways eligible for assistance under Chapter 23 of the U.S. Code other than those highways functionally classified as local roads and rural minor collectors. 23 U.S.C. § 101(a)(6).

41.     Furthermore, Ohio Revised Code (ORC) Chapter 4115 obliges contractors bidding on public projects to pay their employees prevailing wages. "No person, firm, corporation, or public authority that constructs a public improvement… shall violate the wage provisions of sections 4115.03 to 4115.16 of the Revised Code." ORC § 4115.10(A). Further,

> Any employee upon any public improvement, except an employee to whom or on behalf of whom restitution is made pursuant to division (C) of section 4115.13 of the Revised Code, who is paid less than the fixed rate of wages applicable thereto may recover from such person, firm, corporation, or public authority… the difference between the fixed rate of wages and the amount paid to the employee and in addition thereto a sum equal to twenty-five percent of that difference. The person, firm, corporation, or public authority who fails to pay the rate of wages so fixed shall also pay a penalty to the director of seventy-five percent of the

difference between the fixed rate of wages and the amount to be paid to the employees on the public improvement.

*See* ORC § 4115.10(A).

42.     ORC Chapter 4115 imposes strict liability upon Ohio general contractors for prevailing wage violations by themselves and their subcontractors.

43.     The Ohio Director of Commerce sets Ohio's prevailing wage thresholds, the minimum project costs at which Ohio prevailing wage rules apply, on a biennial basis. As of January 1, 2017, Ohio prevailing wage regulations apply to new construction costing at least $200,000 and remodeling costing at least $60,000.

## VIII.   KARVO'S ILLEGAL SCHEME TO DEFRAUD THE GOVERNMENT AND KARVO EMPLOYEES

44.     Between 2011 and 2017, ODOT awarded Defendant Karvo contracts totaling more than $250 million from bids submitted.  In each year from 2012 to 2017, inclusive, ODOT awarded more than ten (10) contracts to Karvo.  The ODOT-awarded contracts included projects in the Counties of, among others, Butler, Cuyahoga, Geauga, Hamilton, Lake, Summit and Warren.

45.     The majority of ODOT-awarded contracts to Karvo included federal funds. Federal funding composes a substantial portion of ODOT expenditures. In Fiscal Year 2016, the Federal Highway Trust Fund provided 41% of ODOT's funding.  Approximately 83% (or $1.15 billion) of the Federal Highway Trust Fund money in Ohio went to road and bridge construction or maintenance.

46.     As a result, the majority of contracts awarded to Karvo by ODOT required compliance with the terms of the DOT DBE program and prevailing wage.  For example, ODOT

project number 150221 in Hamilton County for SR 125-5.20 included federal funds and had a
DBE goal of $281,485.80, or 9% of the contract award.

47.     Karvo has received millions of dollars in DOT funds as a result of its knowingly
fraudulent statements and claims for payment concerning compliance with the terms of the DOT
DBE program and the Davis-Bacon Act.

48.     Had the United States, DOT, or ODOT been aware of the Defendants' false and
fraudulent statements and claims for payment, millions of dollars would not have been paid to
Karvo.

### A.     Karvo Trucking Drivers Performed Work on ODOT Contracts Instead of DBE Subcontractors.

49.     Karvo Trucking and its drivers regularly performed the work of DBE
subcontractors on the federally-funded Karvo projects where Relator-Plaintiff worked.

50.     As a truck driver for Defendants, Relator-Plaintiff reported to the Karvo office
each morning by 6:00 a.m. in order to, *inter alia,* receive an assignment from Defendants' truck
dispatchers.  These assignments were handed out to each Karvo Trucking driver.

51.     DBE subcontractors also received daily assignments from Defendants' truck
dispatchers instructing them where to report and what tasks to perform.

52.     Defendants incorporated the employee and DBE assignments into a daily delivery
list that it issued to the truck bosses, including Relator-Plaintiff, for the purpose of tracking
trucks entering and leaving a given site. As a result of these lists, Relator-Plaintiff was aware on
a daily basis of which trucks were working on which Karvo job sites.

53.     Relator-Plaintiff regularly witnessed DBE subcontractors working on federally-
funded ODOT projects at the outset, only to be completely replaced by Karvo Trucking and its
drivers shortly thereafter.

54.     Relator-Plaintiff and other Karvo Trucking drivers received work on Karvo jobs consistently. There were regularly periods where Karvo Trucking drivers were working on a federally-funded ODOT-awarded contract and no DBE subcontractors were working.

55.     The majority of work assigned to DBEs on Karvo projects were in trucking.  For most projects, Karvo had its own employees perform all of the other work on the ODOT contract.

**B.      Defendants Falsified Asphalt and Trucking Tickets in Order to Hide Karvo Trucking's Actual Performance of the DBE Work.**

56.     On certain occasions, Defendants falsified asphalt and trucking tickets to hide the fact that Karvo Trucking and its drivers performed DBE subcontractors' work. A trucking ticket is paperwork used to document the materials hauled, their quantity, the site of work on which they were used, and the times of pickup and delivery.

57.     The Arlington Road Project (Karvo Job Number 16181) is an example of a contract paid for with DOT funds where the paperwork was falsified.  The asphalt tickets used for this project were turned in with the name of Skios Trucking (hereinafter referred to as "Skios").

58.     Skios is a DBE used by Karvo on ODOT contracts.  Skios is owned by Pamela Skeriotis, the sister of George Karvounides, Karvo's owner.  Her husband, Nick Skeriotis, operates the company.

59.     Karvo Trucking drivers hauled asphalt in Defendants' trucks despite the designation of these loads for Skios. Relator-Plaintiff was employed by Defendants and drove Karvo Trucking truck number K-156 when he picked up asphalt loads designated for Skios.

60.    The load tickets turned in by Relator-Plaintiff at the job site falsely indicated that the loads were picked up and delivered by Skios. The tickets were falsified for a single purpose - to avoid detection by ODOT concerning the amount of work actually performed by Skios.

61.    At other times, Karvo supervisors instructed Karvo Trucking drivers to falsify trucking tickets to state that the work was performed with trucks owned and operated by a DBE subcontractor rather than Defendants.

62.    Relator-Plaintiff retained a copy of the fraudulent asphalt load tickets from the Arlington Road Project and later voluntarily provided this evidence, along with falsified tickets from different projects and with the names of other DBE subcontractors, to ODOT.

**C.    Defendants Did Not Pay Prevailing Wages to Karvo Trucking Drivers.**

63.    Relator-Plaintiff has never received the prevailing wage while employed by Defendants despite spending significant periods of time on the job sites of ODOT-awarded contracts.

64.    Since he began work for Defendants in 2006, Relator-Plaintiff has been paid an hourly rate of between $13.50 and $18.00 per hour, before overtime. Relator-Plaintiff also received a predetermined daily payment for travel time based on the location of the job site in lieu of an hourly rate.

65.    Relator-Plaintiff frequently spent enough time on the job site to qualify for a prevailing wage. Specifically, Relator-Plaintiff regularly spent more than 25% of his work week at a given site of work.

66.    Relator-Plaintiff regularly performed various tasks at the site of work, including unloading materials (asphalt and stone), transporting spoils out of or within the site of work, or working as the "cleanup truck" following a scraper to receive millings cut from a road service for

dumping. Relator-Plaintiff documented his daily tasks, including the time on the site of work, on trucking tickets which were turned over to Karvo at the end of every day.

67. Pursuant to the Davis-Bacon Act, Relator-Plaintiff qualifies as a "Truck Driver" under Department of Labor General Decision Number OH170002 ("OH170002"). As a result, Relator-Plaintiff should have been paid a minimum hourly rate of $26.68 and fringe benefits of $14.31 per hour, with a higher rate applicable in certain specific counties.

68. Defendants were well aware of the prevailing wage requirements and their non-compliance. In or about September or October 2015, Relator-Plaintiff witnessed a discussion between senior members of Karvo management including George Karvounides, Gust Karvounides, John Chirappa ("Chirappa"), and Mike Titaro. Chirappa told George Karvounides, "Just bite the bullet and pay the drivers prevailing wage." George Karvounides responded, "It will be a cold day in hell before I pay a driver a prevailing wage."

69. As a truck driver, Relator-Plaintiff began each workday by arriving to the Karvo office at or before the required 6:00 a.m. check in time. Once at the office, he prepared his truck for the day's loads, which required him to fuel the truck and perform safety checks, and receive instructions. He then drove his truck to a designated location, either the site of work or a materials depot, where he was to arrive no later than 7:00 a.m. Relator-Plaintiff did not "clock in" until 7:00 a.m., when he arrived at either the site of work or a materials depot. Relator-Plaintiff was "clocked out" each day at or about 4:00 p.m., when he left the site of work. After leaving the site of work, he was required to return his truck to Karvo's office.

70. The Arlington Road Improvement Project provides a snapshot of the work Relator-Plaintiff performed for Defendants. Karvo was awarded the prime contract to perform $2,537,296.60 worth of improvements to Arlington Road from the City of Green Line, OH to

Warner Road, an amount which later increased to $2,671,539.09. The improvements included upgrading traffic signals, resurfacing the roadway, installing a north bound left hand turn lane at Warner Road, constructing sidewalks, relocating utilities, and upgrading signage and pavement markings. The Federal Highway Administration provided 80% of the funding for the project.

71.     Relator-Plaintiff worked on the Arlington Road Project for approximately two weeks, hauling asphalt between the site of work and the Shelly Copley Plant on Saw Mill Road in Copley, OH. Loads took approximately 30 minutes to transit between the Copley plant and the site of work, and Relator-Plaintiff completed an average of five or six loads each day. He spent three to four hours on the road each day, one to two hours at the site of work, and one to two hours at the Shelly Copley plant.

72.     There are many examples of ODOT projects where Relator-Plaintiff's time on site exceeded a *de minimus* amount.  While working on the Auburn Crile Project (Karvo Job Number 15117) in October 2016, Relator-Plaintiff also qualified for the prevailing wage. On an average day, Relator-Plaintiff arrived at the site of work at 7:00 a.m. and spent several hours running loads of spoils between locations within the site of work while intermittently running loads to the dump and back.

73.     On the Bell Road Project (ODOT Project Number 130540), Relator-Plaintiff hauled spoils (dirt dug from the side of the road to add to the sewer and widen the road) from the job site to the back of a nearby garden center. He regularly spent several hours each day on the site of work.

74.     When Relator-Plaintiff mentioned to Yianni Karvounides, Karvo's President, the dump site's proximity to the Bell Road Project job site, Yianni Karvounides said, "Don't even start that prevailing wage shit with me." The following week, the dump for the site was changed

to one on the opposite side of town, roughly seven miles away in the Twinsburg Development, at the corner of Rt. 306 and Treat Road.

75.     Throughout his employment, Relator-Plaintiff received wages far below those required by the Davis-Bacon Act. Other Karvo Trucking drivers similarly performed sufficient work on projects to qualify for a prevailing wage. Defendants, however, did not pay these drivers a prevailing wage when they qualified.

76.     In order to receive payments under the contracts paid for with DOT funds, Karvo knowingly submitted fraudulent records concerning the payment of a prevailing wage to employees and submitted false certifications in claims for payment concerning its payment of the prevailing wage.

**D.      Karvo Submitted False Claims for Payment.**

77.     ODOT requires each contractor to submit a notarized affidavit concerning its actual payments to DBE subcontractors within 15 days of project completion and mail it to the ODOT Office of Contracts in Columbus, Ohio.

78.     The DBE must have been responsible for the performance, management and supervision of all work identified in their subcontract agreement in order for the payments to count toward the DBE goal which requires the DBE to perform a commercially useful function.

79.     If a Contractor does not meet the DBE goal of a contract, they must send a written request documenting the progress and efforts in securing DBE subcontractors, as well as indicate a good faith effort was made to meet the goal.

80.     During projects requiring compliance with prevailing wage laws, a payroll certification of compliance subject to civil or criminal penalties for willful falsification must be

completed. Upon completion of projects, Ohio Revised Code Section 4115.07 requires the submission of an affidavit of compliance with prevailing wage rates prior to final payment.

81.     Upon information and belief, Karvo submitted false certifications and fraudulent statements to ODOT upon completion of the federally-funded ODOT contracts as Karvo did not pay the prevailing wage or make a good faith effort to use the DBE subcontractors.

82.     After Defendants completed projects, federal funds were paid to Karvo. Specifically, by way of example, payments to Karvo from federal funds were authorized on the Arlington Road Project by the County of Summit, Ohio's Board of Control Resolution No. 2016-150 on May 9, 2016, and supplemental payment approved in Board of Control Resolution No. 2017-072 on March 6, 2017.

83.     Upon information and belief, the fraudulent statements concerning DBE requirement compliance and false claims for payment extended beyond the projects where Relator-Plaintiff worked to include other Karvo contracts awarded by ODOT.

84.     If the United States, DOT, or ODOT had known about the false claims for payment, they would not have permitted or authorized the payment of funds to Karvo. Compliance with the terms of the DBE program and the prevailing wage laws are material to government decisions to award and pay claims under the contracts identified in this complaint.

**E.      Defendants Continued to Bid on and Receive ODOT Contracts While Knowingly Violating Federal Law.**

85.     After Defendants knowingly violated federal law, they submitted bids for ODOT contracts with fraudulent statements concerning the prospective participation of DBE subcontractors.

86.     All bidders on ODOT projects must submit a DBE Utilization Plan at the time of bid demonstrating how it will achieve the DBE goal. The plan must include the names and

address of the DBE firm(s), a description of the work to be performed by each DBE, the dollar amount of the participation of each DBE.  In 2017, Karvo typically submitted bids with a DBE commitment of between 6 and 11 percent.

87.     By submitting a DBE Utilization Plan, the bidder commits to use the identified DBE firms.  In order to terminate or replace an identified DBE firm, the bidder must obtain ODOT's written consent.

88.     When Karvo submitted its DBE Utilization Plan, it did not intend to provide the DBEs the level of work promised.

89.     On acceptance of its bid, Karvo entered into a contract with ODOT wherein Karvo promised to uphold its obligations under the Davis-Bacon Act by incorporating form FHWA-1273 as required by 29 C.F.R. § 5.5(a).  Nevertheless, Karvo was not in compliance with the Davis-Bacon Act at the time it entered into these contracts and had no intention of complying with its terms.

90.     Without these statements and representations, ODOT would not have awarded the federally funded contracts to Karvo.  The DBE usage and Davis-Bacon Act compliance are material to the award of the ODOT contract and the payment of federal funds.  If the United States, DOT, or ODOT had actual knowledge of the details of the Defendants' fraud, they would not have awarded the contracts to Karvo.

91.     As a result of the ODOT contracts that Defendants received because of their fraudulent statements, Karvo wrongfully received millions of dollars in federal funds from DOT.

**F.     Karvo Retaliated Against Relator-Plaintiff.**

92.     Relator-Plaintiff witnessed intentional violations of DBE and Davis-Bacon Act requirements during his work for Defendants.

93. In order to stop these violations, Relator-Plaintiff reported these acts to Mary Hodgson, ODOT District 3 Contractor Compliance Officer, in or around November 2016. Relator-Plaintiff showed ODOT investigator Mary Hodgson his falsified asphalt and trucking tickets from the Arlington Road Project and other Karvo projects as proof of Defendants' DBE fraud.

94. Relator-Plaintiff subsequently organized a meeting between ODOT and Defendants' asphalt truck drivers to provide additional evidence of misconduct.

95. On or about December 3, 2016, Relator received a call from coworker Herb Kohler informing him that Gust Karvounides knew about the meeting and Gust Karvounides recommended drivers not attend the meeting with ODOT investigators.

96. On or about December 4, 2016, Relator-Plaintiff attended the meeting along with several other asphalt truck drivers. Additional information concerning Defendants' misconduct was provided to Rhonda Voisard and Jeff Inman of ODOT, as well as Relator-Plaintiff's copies of the fraudulent tickets.

97. Upon information and belief, Defendants learned that Relator-Plaintiff organized the meeting at ODOT.

98. After this meeting, Relator-Plaintiff learned that Defendants terminated his medical insurance. Relator-Plaintiff lost coverage at the end of 2016. This was the first time since his hiring in 2006 that Defendants had cancelled Relator-Plaintiff's medical insurance in the winter. Defendants did not respond to an inquiry from Relator-Plaintiff as to why they cut off his insurance.

99.     Historically, Defendants have each winter laid off its asphalt truck drivers beginning around December and lasting until around March.  Ordinarily, they are all brought back in the spring and the list of asphalt truck drivers varies little from year to year.

100.    Relator-Plaintiff contacted Defendants about work in 2017 and Defendants did not reply.

101.    Upon information and belief, Defendants ended his insurance coverage and refused to provide additional hours of employment to him in retaliation for attempting to stop Defendants' violations by reporting them to ODOT.

**LEGAL CLAIMS FOR RELIEF**

102.    Relator-Plaintiff alleges that Defendants' conduct detailed above violates the False Claims Act ("FCA") of the United States, 31 U.S.C. §§ 3729-3733, as amended.

**COUNT ONE**

**Violations of the False Claims Act,**
**31 U.S.C. § 3729(a)(1)(A)**

103.    Relator-Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

104.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval …

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 … plus three times the amount of damages which the Government sustains because of the act of the person….

105.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States, including DBE certifications and payroll certifications as specified above, and any other similarly situated certifications may be identified during discovery in this case.

106.    Defendants submitted or caused to be submitted these false claims with actual knowledge of their falsity, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

107.    In reliance on the accuracy of the false or fraudulent claims presented or caused to be presented by Defendants, as well as Defendants' representations, certifications and data, the United States has paid said claims and have suffered substantial financial losses because of these acts by Defendants.

108.    Relator-Plaintiff believes and avers that he is an "original source" of the facts and information on which this action is based.

## COUNT TWO

### Violations of the False Claims Act,
### 31 U.S.C. § 3729(a)(1)(B)

109.    Relator-Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

110.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ...
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 ... plus three times the amount

of damages which the Government sustains because of the act of the person....

111. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment or approval by the United States, including DBE Certifications and payroll certifications as specified above, and any other similarly situated certifications may be identified during discovery in this case. Defendants knew that the records or statements were false or fraudulent, or were deliberately ignorant of the truth or falsity of the information, or acted in reckless disregard for whether the information was true or false.

112. Each representation or certification of compliance with the applicable laws and regulations by Defendants, as well as each claim presented or caused to be presented for payment and approval by the United States, represents a false or fraudulent record or statement under the FCA and the other false claims statutes.

113. The United States, unaware of the false or fraudulent claims and statements or records and in reliance on the accuracy of these statements and claims, has paid said claims and has suffered substantial financial losses because of these acts by Defendants.

114. Relator-Plaintiff believes and avers that he is an "original source" of the facts and information on which this action is based.

## COUNT THREE

### Violations of the False Claims Act,
### 31 U.S.C. § 3729(a)(1)(C)

115. Relator-Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

116.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), provides in relevant part that any person who:

> conspires to commit a violation of subparagraph (A), (B), (D), (E), (F) or (G) …
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 … plus three times the amount of damages which the Government sustains because of the act of the person….

117.     Defendants entered into conspiracies with each other for the purpose of defrauding the United States.

118.     By the foregoing acts and omissions, Defendants took actions in furtherance of its conspiracies, including but not limited to the decision to protect Defendants' wrongful conduct from exposure.

119.     By virtue of the acts described above, Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B)) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval and by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims.

120.     At all times relevant to the complaint, Defendants' acted with the requisite knowledge.  Defendants knew that these claims and statements were false or fraudulent, or were deliberately ignorant of the truth or falsity of the claims and statements, or acted in reckless disregard for whether the claims and statements were true or false.

121.     As a direct and proximate consequence of Defendants' conspiratorial conduct, the United States has suffered substantial financial damages in an amount to be proved at trial.

122.     Relator-Plaintiff believes and avers that he is an "original source" of the facts and information on which this action is based.

## COUNT FOUR

### Violations of the False Claims Act,
### 31 U.S.C. § 3730(h)

123.     Relator-Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

124.     The False Claims Act, 31 U.S.C. § 3730(h), provides in relevant part that any employee:

> shall be entitled to all relief necessary to make that employee *** whole, if that employee *** is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee *** in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter. ***
> Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

125.     By the foregoing acts and omissions, Defendants took actions in retaliation against Relator-Plaintiff, including changing the terms and conditions of Relator-Plaintiff's employment, in response to Relator-Plaintiff's good faith attempts in furtherance of compliance with, and to prevent violations of, 31 U.S.C. §3729, et seq.

## COUNT FIVE

### Violations of Ohio's Prevailing Wage Law
### ORC 4115(A)

126.     Relator-Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

127.    Ohio Revised Code § 4115 codifies Ohio's Prevailing Wage Law. The code section requires that a prevailing wage be paid to skilled trades employees on public improvement construction projects, stating:

> No person, firm, corporation, or public authority that constructs a public improvement *** shall violate the wage provisions of sections 4115.03 to 4115.06 of the Revised Code***. Any employee upon any public improvement, except an employee to whom or on behalf of whom restitution is made pursuant to Division (C) of section 4115.13 of the Revised Code, who is paid less than the fixed rate of wages applicable thereto may recover from such person, firm, corporation, or public authority *** the difference between the fixed rate of wages and the amount paid to the employee and in addition thereto a sum equal to twenty-five percent of that difference. The person, firm, corporation, or public authority who fails to pay the rate of wages so fixed also shall pay a penalty to the director of seventy-five per cent of the difference between the fixed rate of wages and the amount to be paid to the employees on the public improvement.

128.    Defendants failed to pay prevailing wages to Relator-Plaintiff and other Karvo truck drivers on new construction projects the costs of which each amounted to more than $250,000.00 in all instances.

129.    As a direct result of Defendants' conduct, Relator-Plaintiff has been harmed by the non-payment of fixed wages in violation of Ohio Revised Code Sections 4115.03 to 4115.06.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment against the Defendants as follows:

A.    That the Defendants be enjoined from violating the provisions of 31 U.S.C. § 3729 *et seq.*;

B.    That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, plus a civil penalty of not less than $5,000.00 and not more than

$10,000.00, as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, for each violation of 31 U.S.C. § 3729 *et seq*;

      C.     That Relator-Plaintiff be awarded the maximum amount allowable pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

      D.     That Relator-Plaintiff be awarded all costs of this action, including reasonable attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);

      E.     That Relator-Plaintiff be awarded relief from the retaliatory actions pursuant to 31 U.S.C. § 3730(h), including 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained, litigation costs and reasonable attorneys' fees;

      F.     That Relator-Plaintiff be awarded relief from damages pursuant to Ohio Revised Code Section 4115(A), including the difference between the fixed rate of wages and the amount paid to Relator-Plaintiff and in addition thereto a sum equal to twenty-five percent of that difference; and

      G.     That the United States, the States, and the Plaintiffs be granted such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demands a jury trial.

DATED: October 24, 2017    Respectfully submitted,

             FREDERICK M. MORGAN, JR. (0027687)
             Morgan Verkamp LLC
             35 East 7th St., Ste. 600
             Cincinnati, Ohio 45202
             Phone: (513) 651-4400
             Fax: (513) 651-4405
             Email: rmorgan@morganverkamp.com
             *Trial Attorney*


             ERIC L. YOUNG (PA 84109)
             ROBERT A. MELTON (PA 204916)
             McEldrew Young, Attorneys-at-Law
             123 S. Broad Street, Suite 2250
             Philadelphia, PA 19109
             Phone: 215-367-5151
             Fax: 215-367-5143
             Email: eyoung@mceldrewyoung.com
                rmelton@mceldrewyoung.com
             *Lead Counsel*